Ladies and gentlemen, our first case for argument is Methodist Health Services v. OSF Healthcare System. Mr. Greenberg. Good morning, your honors. May it please the court. My name is Richard Greenberg and I'm here for Methodist Medical Center, the plaintiff appellate in this case. This antitrust case from the Central District of Illinois involves exclusive dealing healthcare contracts. And there are two key factual aspects to this case. One is OSF's conceded monopoly power, which allows it to both restrict competition and to charge super competitive prices, which are not justified by either the quality, uniqueness, or sophistication of its services. How long are these exclusive contracts? The exclusive contract with Caterpillar was 9 years, although it had a 10 year contract before that. With Humana it was 7 years and then it was renewed for a like period in 2015. For Health Alliance it was 5 years and for Aetna it was 3 years. Now with reference to Blue Cross Blue Shield, OSF has had exclusive dealing contractual relationships with Blue Cross for about 15 years. What was to prevent you from making such contracts? We were not permitted to be at the bargaining table, your honor. What does that mean? It means OSF used its monopoly power to preclude... No, I don't understand. So they have exclusive contracts with X, Y, and Z. Why couldn't you have asked those companies 3 years ago, 5, 7 years ago, whatever, to have an exclusive contract with Methodist? Well, the short answer is we did ask those companies. Yeah, I know what they said. They said we can't talk to you about being in our networks because of OSF. Wait, I don't understand that. This is before they've signed a contract with, what is it, St. Francis, is that what we call it? Yes. Before they've signed the contract, why wouldn't they be willing to consider signing the contract with you? Because they, for example, with Blue Cross Blue Shield, it considered OSF a must-have hospital. It had to have the OSF hospitals... Oh, you mean OSF is better? No, not... Well, it sounds like it. Why do they have to have OSF unless it provides more services? It does provide certain unique services, and the fear, I believe, which is in the record, is that if they did not have OSF in their networks, that OSF could charge outrageous prices for its few unique services. 90% of the services that were offered by OSF were also offered by Methodist, and in fact, in terms of quality, Methodist was the same or better than OSF. However... Then why didn't these companies sign with you? They were afraid if they signed with us, even if they had a good deal, a few very expensive cases could turn the tide in terms of making their contracts unprofitable. For example, OSF had a NICU unit for pediatric care. Well, why don't you have a unit like that? We didn't have a unit like that. Yeah, well, create a unit like that. Yes, we didn't have a unit like that for two reasons, but the main reason is that because of the exclusive contracts that... No, I'm talking before the exclusive contracts. Before the exclusive contracts, these various services, you know, Blue Cross and so on, they presumably will sign with whatever hospital offers them the best deal. That is not the case. The record here disputes that. Why not? They sign an inferior deal? Why would they do that? Yes, they did. Why? Because of OSF's ability to coerce the insurer. What does that mean, ability to coerce? All they can do is ask you to sign a contract. They can't coerce you. Well, the testimony in this case by Blue Cross Blue Shield is that in all of the state of Illinois, OSF has the only hospitals with which it has exclusive dealing arrangements, and yet it pays higher prices to OSF than it does to hospitals that don't have exclusive dealings. So it's kind of caught over a barrel. I don't understand. It doesn't have to deal with OSF. It can deal with you. If it deals with us, then OSF will charge outrageous prices for some of its unique services, which would make the contracts unprofitable for the insurers. Unique services? Like what? The unique services was it had a level one trauma center. It had a pediatric intensive care unit. So why doesn't Methodist have a level one? Well, one of the reasons is because Methodist could not get into these contracts, it could not generate sufficient revenue to grow. In fact, in 2009, Methodist hired a health care consultant, Kauffman Hall, this is in the record, and was discussing the question of whether it would build a replacement hospital and possibly with new services. And the recommendation of Kauffman Hall was that Methodist could not afford to build a replacement hospital unless it got into the Blue Cross Blue Shield PPO network, because otherwise it would not generate sufficient revenue. So we think that this dominant, I mean, for purposes of summary judgment, OSF has conceded its monopoly power, and I think this is one of those cases where I don't know what you mean by monopoly power. They have exclusive contracts. The question is why you didn't beat them to the punch and sign exclusive contracts with these services. I think one of the answers is probably best described by OSF's own expert. At paragraph 119 at Alan Willig's report, he says, the potential inclusion of Methodist in the BCBSIL PPO network had been a subject of ongoing negotiations between BCBSIL and St. Francis since at least 2005. So it was Methodist competitor and Blue Cross Blue Shield. So St. Francis beat you to it. They didn't beat us to it. We asked several times if we could discuss being in the contract every time it was up for renewal, and we were told on some occasions, no, we cannot discuss that because OSF won't let us. And in 15 years, we were only allowed to propose rates one time. When you say OSF wouldn't let us, you mean OSF had a contract with your potential customer? No, Blue Cross Blue Shield told us that they had to have OSF in network and OSF would not allow Methodist in, which is consistent with OSF's policy. Its managed care contracting policy was to get exclusive contracts. Its CEO ordered the head of managed care contracting never to discuss the question of getting rid of exclusivity with Blue Cross Blue Shield. It never did. And even though Blue Cross Blue Shield on many, many occasions over the years asked OSF to provide rates for open networks, OSF never even showed what those rates would be. So did you complain to the Justice Department or the Department of Health that you're being screwed by this rapacious competitor? I don't think we did go to the Justice Department or to the Department of Health, Your Honor. Why not? Well, I should amend that. For purposes, one of our causes of action required us to provide the complaint to the Attorney General's office, and we did do that. So government agencies, I think, would be normally very interested in a case like this, but unfortunately they're constrained by resources and personnel, and we can't dictate their agenda and what their priorities are. Well, the district judge focused substantially, if not exclusively, on being foreclosed. Correct. And she went into percentages, and the bottom line was she thought that they were only restrained from about 20 percent of the market, at least on some things. And the must-have issue with whatever they call themselves, OSF or St. Francis, whatever, they did, frankly, had the exclusive expertise to do very high technical stuff, organ transplants, for example. And you mentioned the, what do you call it, pediatric? Pediatric intensive care unit. Yeah, intensive care, yeah. And so those are things that everybody doesn't do, but some people think you've got to have that there for catastrophic stuff and things like that. But it does seem that the district judge went through a pretty thorough examination about the other opportunities, the other competition, and of course you have Caterpillar, sort of the elephant in the room, that you're self-insured. And it seemed, in looking at the district court's opinion, it pretty much, I thought at least, she went into a lot of detail. Now, she didn't get into the harm to competition much. That was the other part of it. Was it B3, whatever? And I think that's an interesting omission, but it does seem that she focused strictly on the foreclosure issue and that you were not sufficiently harmed by that to win. Your Honor, one of the points on appeal is that the district court judge, with all due respect, used the wrong analysis in analyzing foreclosure. For example, the district court determined that a significant percentage should be deducted from our foreclosure because we served some patients out of network. However, as this court articulated in its October 31, 2016 opinion in FTC versus Advocate, hospital care is sold in two stages. The first stage is where hospitals compete with each other to get in insurers' networks and then what those insurers will charge. The second stage, which is not price sensitive, the first stage is highly price sensitive, is where the hospitals in network may compete against each other on amenities, location, and so on for patients. I think we have established that in-network status here is the critical bridge to competition and the real question is whether, just because there's a potential alternative, I think you have to assess whether it has any practical ability to restrain the power of the monopolist. The power of the monopolist, they just have contracts. If you outbid them, you get the contracts. They don't just have contracts, Your Honor. I think it's pretty clear that they have abused their monopoly power. That's just words, abused. They have contracts. When those contracts expire, you can compete for the contracts. With all due respect, besides the $30 million in consumer- Look at Chicago. You have Northwestern, a gigantic, sprawling complex of hospitals and clinics and this and that, all very modern, very popular. Then you have the University of Chicago Hospital, which is much smaller but still high quality. Then you have a lot of lesser hospitals all over the place. No one is saying break up Northwestern because it's the most successful and the wealthiest and has the most contracts. We're not suggesting that OSF should be broken up. What we're suggesting is that it's the means by which it has maintained its very- But all it means is it signs contracts. What do you expect it to do? It does more than sign contracts, Your Honor. I think we have put in the record that of all the teaching hospitals in Illinois, including the ones you just mentioned, Northwestern, University of Chicago, Rush, and other hospitals in much more expensive locations than Peoria, OSF has the highest prices, 20% higher than the next highest teaching hospital, even though those other hospitals have more sophisticated services. Yes, well, you'd think that high prices would be very attractive to competitors. So the competitors would go to the potential customer and say, Look, St. Francis charged these astronomical prices. We'll do much better by it. Well, the problem is that from a consumer's perspective, they really only know two things about price. They know that if they go in network, which they're advised to do by their insurers, their employers, and advocacy groups, if they stay in network, it doesn't matter what hospital they go to. The price is going to be the same, and it's not going to be very much. They also know that if they go out of network, it's going to be higher, and personally higher to them. So the consumers don't really have a choice, which is why we think it is so critical that in-network status be evaluated and recognized as the critical bridge to competition in this area. Serving out-of-network patients is a little bit like the fact that, for example, in the Microsoft case, Netscape had access to the full market. However, because it couldn't get its software preloaded on the Microsoft system, it was effectively ruled out. Yes, and the antitrust action against Microsoft went nowhere. Netscape died. Microsoft survives. The Justice Department sued it. Nothing happened. Well, it's always tough to make predictions about what will happen, especially about the future, but still, the law is... I think the point made in that case is still significant. I think the case law establishes that if you're going to look at a potential alternative, it can't just be a possible alternative. It has to be viable, viable in the sense of being practical and feasible as a means to constrain competition. You say, though, that the monopoly that you refer to, I assume you mean the things that only St. Francis can do. That's what I... It's the only thing you can even identify as a monopoly power because they're the only ones that can do this very sophisticated, you know, you say, neonatal organ transplant and maybe a couple of others where Methodist does not have the skilled people to do that. Is that what you say is monopoly? That is the source of its monopoly leverage, but... Okay, well, then focus on that, if that's what you're going to do, because when you seek payment monopoly, it's not the case with most everything. Those of us who are consumers, we call them preferred providers in network. Right. And, you know, you always want to go to the doctor who's a preferred provider, and so other people are kind of frozen out if they're not a preferred provider, and doctors fight with that about who gets to be... So you have a lot of people who are in the mix of the competition, not just the hospitals, but you have the insurance companies, you have the doctors and medical, and then the very basic consumer. I agree with that, Your Honor. However, in this case, what we have alleged the relevant product markets to be in which the district court agreed with us was the sale to commercial payers of inpatient acute care hospital services and outpatient surgical services. And government payers, Medicaid and Medicare, are losers, right? Well, they're not losers, but they're not part of their... Well, they say they lose money when they have to do those. Correct. So they want to go compete for the others. I can understand that, but the consumer... So when the district court looks at consumers, for example, in out-of-network treatment, it's not even evaluating the relevant market. And as this court said in FTC v. Advocate, insurers are the most relevant buyers. It's the insurers who dictate what is going to happen to the consumer. There are a lot of those. A lot of insurers, Your Honor? Yes. Yes, there are. Although for the whole relevant period up until today, OSF has been able to sustain a very high market share, over 50%. And the reason it's been able to do that is that a dominant firm exercising monopoly power inappropriately, we believe that strategically arranges exclusive dealing contracts can really squeeze its competitor. And in our particular case, it really prevented us from effectively competing and from growing in a way that would allow us to compete with it. And I think the case has recognized, Densply and others, that the delayed growth from that sort of arrangement because Methodist is forced to explore more expensive and less efficient alternatives is consumer harm. And we think that, in addition, we have shown foreclosure by virtue of the $30 million in consumer harm and by other things. Patients don't have the choice to go to Methodist. They're denied the ability to get higher quality services on the many services. So are they complaining? Yes, they have complained. They've complained. Caterpillar went to Blue Cross Blue Shield and said, we really think you need to let Methodist in your network. There have been letters written to Blue Cross Blue Shield by brokers and others saying, let Methodist in network. In fact, Methodist itself has said, but for the exclusivity provision, we would have Methodist in network. In fact, Blue Cross Blue Shield said that because of the irrational antipathy of OSF to Methodist, they were the ones who suggested that Methodist sue OSF and even Blue Cross, if necessary, to get rid of the exclusivity contract because they felt, because of OSF's power in the market, they were not able to do it on a contractual basis, on a negotiation basis. So you wouldn't sign an exclusive contract? Excuse me? You wouldn't sign an exclusive contract with a customer, you, Methodist? We might. Oh, you might? Well, in our marketing... Oh, just like OSF? No. OSF insists on exclusivity and never offers prices. What we do when we approach our customers is we say, you can have an exclusive network or an open network. These are the prices you choose, and whatever you want, that's what we will do. And so there's a big difference in the way we approach the market and, you know, the hammer... Why don't you want to have exclusive contracts? We want to be customer-friendly. We want to serve our customers. What you call open network, though, who defines the network? The insurer defines the network. The insurer? In most cases, the insurer defines the network. And what is it? Is it that St. Francis tells the insurer, you know, we won't honor your insurance because you're not, I don't know, what, primary here? I don't know. How does that network become confined? It becomes confined because OSF, according to the contemporaneous writings of Blue Cross Blue Shield, said OSF has, they were afraid that OSF would charge ransom if we tried to allow... Charge what? Ransom, that's their word, if they allowed Methodists in. And in addition, they said that... Just because they have these exclusive areas, which they're the only ones that do it, they can dictate the, I guess, the market, whatever you want to call it. I always go back to preferred providers. Can't everybody be a preferred provider? We cannot. Can't you just declare that or something? You will match anybody else or something like that? No, Blue Cross Blue Shield said that the great threat to them was that for years OSF had threatened that they would leave the network if Methodists was included, and that is something that they could... The district judge said that Blue Cross Blue Shield was about 20%, and that wasn't a big enough bite to make a monopoly, I guess. It would be exclusive, foreclosure. That was her foreclosure analysis. Yes. Your Honors, if I may, I see the white light is on. If I could reserve a few minutes for rebuttal, unless you have any other questions. How much will you get from the white to the red for rebuttal, however much time you have left? Excuse me? How much time does he have left? I'm going to go back to the top. You better sit down, I guess. Okay, thank you, Your Honor. Okay, so we'll hear from Ms. Sicalides. Can I see that correctly? Good morning. May it please the Court, my name is Barbara Sicalides, and I represent OSF Healthcare, in this case doing business at St. Francis Medical Center. I'd like to address some of the comments made by Mr. Greenberg, and I'd like to start off by making the point that these contracts are available to Methodist, and Methodist meets annually with Blue Cross Blue Shield. All the witnesses in the case who testified, who are involved in contract negotiations, testified for UnityPoint and for Blue Cross Blue Shield and the other payers, that they know how to reach the payers, they know when the contracts are coming up for renewal, and they know how to put offers in front of the payers. So this market is open. And with respect to a couple of the contracts in particular that were mentioned, the HAMP contract I'd like to address first. The HAMP contract was one of the first full at-risk contracts that St. Francis had ever entered into. HAMP, also known as Health Alliance, offered the opportunity to Methodist to take, to be an at-full-risk provider to Health Alliance. This is the testimony of Health Alliance, not just the testimony of St. Francis Medical Center. And the testimony of the HAMP witness, which is in the record, was that the offer was made to Methodist, that Methodist rejected the offer, and that it was not just offered once, it was offered more than once, and it was rejected. The witnesses from Methodist testified that they were not ready to do at-risk contracts, and that was even as of the date of the close of discovery in the case. Not ready to what? To handle a full-risk contract. Full-risk meaning what? Something above their pay grade? Something they didn't know how to do? So what would happen in these contracts, and I'll just, not a realistic example, but I'll give you an example. The parties might agree that if there's a tonsillectomy, they'll charge $10. And if the cost of the tonsillectomy exceeds $10, the provider will bear the risk of that, not the insurer. I'm sorry, not what? Not the insurer or the payer. So when you take a full-risk contract, meaning the hospital will be responsible for any difference in what the contract with the insurance company provided for and the actual costs of the services. So in that case, the hospital takes all that risk on themselves. In those cases, the providers routinely seek, this is the testimony of both parties in the case, as well as Health Alliance or HAMP, routinely seek a closed or very narrow network product. This is because the hospitals want to manage the risk the best that they can. So they want to manage the entire continuum of care for the patient. It's very typical in healthcare, particularly with the healthcare reform that's been going on. So it's a very different and unique contract. In their brief, Methodist claims that they agreed to do a risk contract, it's in the record. If you look at the contract that they refer to. When you say a risk contract, they agree that if the tonsillectomy costs more than expected, they pay rather than insure. The hospital absorbs the cost. The hospital pays rather than insure. Right. Methodist claims in their briefing that they were willing to agree to such a proposal, but what they cite for that is a draft contract that only has a risk provision. It's not full risk and it deals only with Caterpillar, which is, yes, a lot of lives, but the HAMP product is much broader than just Caterpillar. So the unequivocal testimony in the record for the HAMP contract was that it was offered to them and they didn't take it. In connection with Blue Cross Blue Shield. Do you mean St. Francis will take that risk? St. Francis is taking that risk. Okay. So something over and above that you find out they're going to be there for 10 days instead of no days. Right. Something happens. Something they didn't anticipate. Right. As my example was oversimplified, but yes, Your Honor. Okay. Now the other thing that I'm curious about is that's the government payer. So. Which I assume is mostly Medicaid and Medicare. It is. And actually. And that's not a good deal for the hospitals. Well, actually, I believe St. Francis Medical Center has over 50% of its revenue is generated through government payers. We actually believe the government payers should be in the market, but the district court rejected that argument and we did not appeal that. So. But at least what I read is that they don't make any, they lose money on those. There are times where you will lose money on a government patient, but, for example, the vast majority of the pediatric patients that St. Francis cares for are government paid patients. Medicaid? Yes. Yeah. And also it's probably better to have a Medicaid patient there as opposed to an empty bed. An empty bed, yes, Your Honor. Yeah. Yes. When you have these fixed costs, the additional funds from the government payers is actually very appealing. The documents in the record reflect that the parties competed very hard for those government patients. And another interesting point to your, the original point that was made, which is where do patients want to go and why do providers, or why do insurers pick OSF over Methodist? In the expert report, there's a chart of where, in fact, the government payer patients go. They have no restraint. They can choose whichever hospital they want to choose. And the overwhelming majority of them choose St. Francis Medical Center. Do you ever turn them down? No. Is that law or is that just by choice? Because a lot of doctors won't take Medicaid, you know. In the record, although I don't know that we cite it in our briefs, in the record, St. Francis Medical Center, it's actually, it is owned by an order of nuns. And they're very strict about those sorts of things, and they don't let the hospital turn away patients. They don't let? The hospital is not permitted to turn away patients. They're not allowed to turn away patients. Right. I mean, there are, obviously, if it's an emergency, a hospital has an obligation to treat those patients. But in St. Francis's case, they don't, they have a policy, in general, they don't turn away patients. Well, you didn't ask Methodist, but I assume they have their share of, maybe you don't know, share of the government payers. Oh, yes. Methodist has had success with government patients as well. The overwhelming majority do come to St. Francis Medical Center, but Methodist does also attract the government patients. The other point I wanted to make was with respect to this argument of that there's no evidence, there is absolutely no evidence in the record that Methodist was unable to invest, to grow, to develop whatever programs it wanted to develop. In fact, the report to which Mr. Greenberg referred, which I believe was by Kaufman Hall, said only that in order to keep a certain bond rating, they needed to have 5% margins. Well, it turns out that they actually did have 5% margins almost the entire time period at issue here, and yet they didn't invest. They had $174 million that was set aside for them by UnityPoint, which acquired them before this lawsuit. By what? Set aside by whom? The company that acquired them, UnityPoint. That acquired Methodist? Methodist. Methodist is no longer an independent hospital. Methodist is part of UnityPoint. How many hospitals are in there? UnityPoint is bigger than we are. How large an area does your hospital draw patients from? So we draw patients all the way up to Bloomington, and not from Chicago generally, although there are a few. It's a very broad draw. It's a destination hospital. What impact does the size of Caterpillar have on the contracts that you entered into? So first I just want to point out that Caterpillar, in 2009, established an HMO product in which Methodist was exclusive. We were not within that plan. So for the entire time period that's at issue, the whole claim period in this case, Methodist had a Caterpillar arrangement. The PPO contract, the Preferred Provider Organization contract, opened in 2010, and in 2010 Caterpillar added Methodist to what had been an exclusive St. Francis Medical Center. Actually, I shouldn't say exclusive because there was another area hospital, Proctor, which was also in network with Caterpillar. Proctor is now owned by Methodist and UnityPoint. What percentage of the patients for your hospital or Methodist, you know, are employees of Caterpillar? Employees? Well, I don't know that exactly because it includes not just employees. It also includes their beneficiaries. Well, yes, right. But we have used the percentages that were in the plaintiff's expert report so as not to create a dispute of fact, and the percentage that was in the report was 12 percent. Twelve percent of your patients? Right. Who has the 12 percent? Caterpillar employees and their beneficiaries represented in 2009 anyway. I don't know what the number is now. It was 12 percent of what? Represented 12 percent of the total available commercially insured patients. Your patients? Total. For everybody. For the whole tri-county market, which is the market that's been alleged by the plaintiff. Well, then explain to me, that is not as high as I thought it might be given the size of Caterpillar. It was higher, Your Honor. It's gone down over time. Well, I read yesterday somewhere else, maybe it's in this record, that Caterpillar has 12,000 employees. Is that right? I don't know, Your Honor. I'm sorry. Okay. Well, I just know that some of it is moving to Chicago, and they mentioned 3,000 employees would be moving to Chicago, which may be irrelevant here. I'm just looking at it just by coincidence. I have read that there were 3,000 also moving to Chicago, but I don't know the actual numbers, Your Honor. Okay. But that's just employees. It doesn't include family. Correct. Yeah, that's a lot of people. Correct. It's a very difficult thing for Peoria to handle, I know. The other thing I wanted to address, although I actually don't think it is necessary for upholding the summary judgment ruling, but there is nothing in the record that reflects that St. Francis Medical Center coerced anybody into anything. If you review the documents that are in the record, there are occasional internal emails, particularly from Blue Cross Blue Shield, where they express irritation at us or Caterpillar, but that is because St. Francis Medical Center does drive a hard bargain. I mean, it's not that they hold a gun to someone's head, and it certainly isn't that they refuse to provide services, but they are a tough negotiator, and that is reflected in the communications. The very witness, Mr. Greenberg referred to the word ransom, the very witness who used the word ransom in an email, in an internal email, testified that he never remembers OSF threatening him, and he also testified that if they had threatened him, he would have remembered that. I mean, he's not the only Blue Cross witness to testify that he wasn't threatened, and in fact not a single Blue Cross witness testified that they were threatened. So the record is devoid of any material fact on the question of coercion. We do have certain unique services, but if you can see in the record, there were many, many, many products that included only Methodist and did not include St. Francis, and before I mention some of those, I also want to note that St. Francis Medical Center had a special contract with Health Alliance or HAMP and also with Coventry during the time period that those payers were exclusively with Methodist. We entered into a separate agreement with them to allow them to access our tertiary and quaternary services, which are the types of services that you were discussing earlier, the NICU, the trauma, the solid organ transplants, the high-level neuroscience and surgery, the cardiac, the most intensive cardiac patients, all of those would be within that agreement. If it was our goal and if we were trying to use our market power, alleged market power, to prevent Methodist from getting any contracts, then why wouldn't we have refused to enter into such tertiary services contracts? But I assume also with, say, Blue Cross, that Blue Cross gets a good deal. Blue Cross gets a very good deal. And with others don't get a good deal. Right, although I'm sure if you talk to Blue Cross, they would complain, but yes. Let's face it, as far as going to anything, we all get old like I am at least. Others speak for themselves. We're all old. Spring chickens, spring chickens. When you go to the doctor or hospital or something, there's two charges. You always wonder about people that don't have any insurance, and yet have, we'll call it an ability to pay. Maybe an employer owns a business or something and could have a very high charge that most people don't have to pay. There's also, for some of these self-funded employer plans, most of them have stopgap insurance or stop-loss insurance in order to protect them from the catastrophic million-dollar baby or terrible neuroscience surgery problem. So there are methods that these employer plans use to try to mitigate the risk of the massive, the situation where there's a very large charge for something that wasn't covered. There's a quality of medical services, it seems to me here, and trying to relate that to a survey of satisfaction, doesn't make any connection. So these surveys are out there, and they're difficult to interpret, and they don't measure a lot of the most important factors. And honestly, it's in the record that St. Francis Medical Center wasn't really good about collecting that kind of information. It didn't really think of it as being that important. It has since changed its view and has decided that it is important for even these external superficial measures to look positive. But in this situation, it's impossible to compare. How can a layperson evaluate the quality of medical care? Most laypeople rely on their physician, and I will point out in this case that all of OSF's physicians are in network with Blue Cross Blue Shield. They are not excluded by our contract. The only thing that was arguably excluded is the hospital services. I also wanted just to note that if you read the contract, it makes very plain that the rates that were agreed to are dependent on the network. But if Blue Cross Blue Shield wants to change the network midterm, they are free to come to us and say to us, look, we want to add Methodist, and because we're going to do that, we need to sit down and renegotiate the rates. Now, I'm not saying they want to do that, and I'm not saying that we would give them the same services for the same rates. We would obviously raise our rates because we would get lower volume. But the contract itself doesn't even preclude Blue Cross from coming back to us. The self-funded employers all have access to Blue Cross Blue Shield, and at the time there were at least three that have taken the option, and I don't want to talk about what's going on today, but it's still a viable option. Additionally, the contract permitted Blue Cross Blue Shield to develop other products with other providers. Having them in a separate network that wasn't necessarily in the network with Children's Hospital and the other things that St. Francis Medical Center had adopted was completely acceptable. Those were not prohibited by the contract. The only thing the contract prohibited, without coming back and renegotiating rates, was they couldn't create the same benefits, so it couldn't look just like our product, the product that we're in. That was the only thing, and if they did that, it couldn't be at better rates than our rates. It could be at the same rates, but it couldn't be at better rates. Was that because of the volume? Right, exactly. So the more you get, the more you can kind of cram it down. Every unity point, every Methodist witness, every payer who testified, and everybody from St. Francis Medical Center who testified said very plainly, it's a question of exchanging volume with rates. If you can give us a lot of volume, then we're going to give you the best rates we can. And I think I should just address that I know what will come back in response to my statement on that front. So the plaintiffs claim that we don't offer these people better rates, but they are better rates, and the evidence shows that. When the Caterpillar network opened, there was a 38% increase. Using the documents upon which they rely, there is a 38% increase on our tertiary and quaternary services, and there was at least, according to this e-mail, at least a 3.7% increase in the regular services. Was that because of the? Because they opened the network, so we would get less volume. Well, okay, I misunderstood. Sorry. I thought you said you got an increase in, we referred to tertiary. Those are the higher-end services, but they're not all necessarily exclusive services. Okay, well, that's. Sorry. It's as tough with everybody. Let's face it, you used to have all this stuff that went out in Congress and Obamacare and whatever else, who gets what. I mean, sometimes you mandate people 20-some years old are mandated to buy something and it ends up being a $6,000 deductible. Right. Which you're not going to use. The Affordable Care Act is a difficult problem, but a brave attempt. So it's a difficult nut to crack and a difficult thing to deal with this issue, that everybody has different preferences and health care is important. Everybody has an opinion. Everybody does have an opinion. Sometimes it's how good the food is and the readings. True. And with respect to HAMP, which opened up, there's an affidavit in the record, which was not objected to in the district court, which reflected the fact that in the middle of the contract, Health Alliance decided to add Methodist to an exclusive contract, and what we ended up doing was renegotiating rates, so there was a 7.5 increase in our rates to Health Alliance. So there clearly is an advantage to the payer to agree to an exclusive agreement with us. They don't all do it, though. Methodist had many exclusives during that time period. It had Unity, it had United, it had Coventry. For a time it had Aetna. For a time it had Health Alliance. It's now back in Health Alliance. It's now back in Aetna, and it's now back in United. It actually never left United, I should say. And then it has its own product, which it sells directly to self-funded employers called Methodist First Choice, which it is very successful at selling, and none of those products include St. Francis Medical Center. So it's pretty obvious, just from what actually happened in the marketplace during this time period, that while St. Francis is desirable and patients do like to come to St. Francis, it is not a must-have hospital. It may be convenient for people and may be nice to have close by, but it's not absolutely a must-have. You've got lots of hospitals in Chicago, too, that provide these similar services, although not as good, of course. So with that, I just wanted to make one other point, which is the reason that the judge didn't really address the antitrust injury point is that below, plaintiff did not argue that the percentage of foreclosure isn't the test. Plaintiff didn't argue that if OSF's rates are higher or if patients don't have as much choice, which, by the way, happens in an exclusive contract, once the payer decides and chooses you, there could be less choice. That's true in any exclusive contract case. But there is choice at the time of choosing the payer. But down below, there was never an argument made that if there are anti-competitive effects, foreclosure percentages are irrelevant. That was never made down below. So it didn't focus on the harm to competition? So she ruled on the foreclosure point and then said, well, I don't need to look at the antitrust injury because I found in their favor. So that's why it wasn't addressed. I just wanted to make sure I addressed that before I sat down. My time is up. Okay. Well, thank you very much, Ms. Sicalides. Thank you. And Mr. Greenberg, do you have anything further? Yes, just a few things, Your Honor. Thank you. So in terms of the pricing, it is not true that OSF gave better prices. OSF's prices to Blue Cross Empyrea are 20% higher than they charge Northwestern here in Chicago. And in terms of getting better deals for exclusivity, it's just not the case. When the CAT network opened, the price increase, according to the CAT people, in a later dated document than the one counsel referred to, said that their price increase overall was 3.4%. Now, that is a lesser price increase than OSF charged to Blue Cross and Humana at the same time, even though it had exclusive dealings with them. But you want to like their charging very high prices to their customers because that makes it easier for you to lure these customers away. Not when the competition is at the insurer level. Again, insurers are the most relevant buyers, and patients think, I can't go, I have no choice, I can't go out of network, otherwise it will cost me more money. That's what they're told, and that's what they believe. And even at Caterpillar, after the network opened... But the insurers aren't indifferent to prices. Well, I think the case law... Because the higher the cost, the more expensive, the more insurance they have to pay out, right? Yes, but given the fact that Blue Cross considered it to be a must-have hospital, I think the case law supports the fact that just because you make the best deal possible doesn't mean that what you're agreeing to is not anti-competitive. Is it a must-have hospital because it's a better hospital? No, it's a must-have hospital because it has certain unique services. Has what? Certain unique services. Right. Sounds better. Okay, well, thank you very much to counsel. Thank you, Your Honor. We'll move on to our next case.